Filed 9/20/22  P. v. Silva CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOE ALBERT SILVA,<br><br>    Defendant and Appellant. | A163801<br><br>(Solano County<br>Super. Ct. Nos. VCR232726 &<br>VCR233601) |

A jury found defendant guilty of 11 acts of lewd conduct by force, fear, or duress on a minor under age 14.  Defendant contends we must reverse the judgment due to insufficiency of the evidence and because the trial court abused its discretion in allowing overwhelming inadmissible and prejudicial evidence to be heard by the jury.  For reasons we will explain, we disagree and affirm.

## I.  BACKGROUND

### A.  *Factual Background*

As we note briefly below, defendant appeals from two cases tried to different juries in the superior court, one involving criminal threats and annoying phone calls, and the other involving lewd acts on a child.  We summarize only the facts pertaining to the lewd acts case, as defendant raises no issues on appeal relating to the criminal threats case.

### 1. G.S.'s Testimony

G.S. was 14 years old at the time of trial. Defendant was her mother's ex-boyfriend. He lived with B.S. (G.S.'s mother), G.S., and her sisters in Vallejo when G.S. was 10 years old. When defendant first moved in, G.S.'s older sister lived with them, as did her younger sister.

G.S. had a good relationship with defendant at first, but after her older sister moved out, "[t]hings in the house started getting more violent" and defendant started touching G.S. G.S. heard defendant throwing her mother in the closet and sometimes they would argue and "he would hit her really bad." G.S. did not see defendant hit her mother, but she heard them yelling and arguing with each other.

Defendant started touching G.S. after her older sister moved out, but she did not remember when that was or if it was "close in time to a birthday." Describing her first memory of when defendant touched her, G.S. explained that defendant opened the door to her room, came into the room, and closed the door. He grabbed her waist and pulled her "in" because she was pulling away. G.S. felt scared because "I knew what my mom had been through, and I knew that things like this could happen and I knew who he was."

Defendant put his hand in his pants and made up-and-down motions. It appeared he was masturbating. While he was masturbating, he was grabbing G.S. by the waist. G.S. tried to resist defendant by hitting him, but he did not stop. Defendant had his hands in his pants about a minute. After he took his hand out of his pants, he used his hand to open G.S.'s mouth and stuck his fingers in her mouth "until [her] throat." G.S. felt something slimy on his fingers.

After he put his fingers in her mouth, defendant touched G.S.'s breasts over her clothes. She was not yet wearing a bra at the time. He applied a lot of pressure to her breasts, which caused her discomfort but not pain.

Defendant stopped touching G.S. when her mother walked down the hallway. G.S. did not say anything to defendant while he was touching her because she was scared.

G.S. did not remember the first time defendant touched her and could not remember how many times defendant touched her, but it was more than a few—"[t]here were so many occasions." When asked how many months the touching lasted, G.S. testified it was "until my sister moved out, until . . . the first time he went to jail." He touched her only on weekends, once every weekend day, Saturday and Sunday. All of the incidents were similar in nature—they all lasted about a minute or longer and always happened in her room. Defendant would "switch off"—sometimes he would grab her breasts first and then put his fingers in her mouth; other times he would put his fingers in her mouth first. She would try to resist by hitting him but that would not stop him. Many times her mother approached her room while defendant was touching her, and he would look at the door, open it, and leave. She did not tell anyone about the touching while it was happening.

One time, defendant and G.S.'s mother, B.S., were arguing at the table, because defendant was hitting B.S. G.S. went to see if her mother was okay and they all talked at the table. G.S. kept asking her mother to leave defendant and her mother kept asking why. G.S. screamed at her and said that defendant was "taking [her] childhood away." G.S. was referring to what defendant was doing to her sexually. G.S. did not explain what she meant, and her mother got mad and told her to go to her room. While they were having this conversation, defendant looked at her from a side angle and gave

3

her a "smile that was very scary." G.S. understood the look to mean that she should stop talking and she did.

G.S. also testified about the fighting she heard between her mother and defendant. G.S. saw bruises on her mother's legs and arms after she heard her mother arguing with defendant. She tried to talk to her mother about what she saw, but her mother denied defendant was hitting her and would not talk about it. G.S. did not believe her mother's denials. She heard defendant threaten to kill her mother "[m]ultiple times," which made her afraid of him. Defendant also said to G.S. that if she ever told, he would kill her mother.

G.S. had two dogs that she was close to—she would talk to the dogs about what was happening to her. She did not talk to anyone else other than the dogs. Defendant took her dogs and placed them "somewhere else"—she did not know where. G.S.'s mother also participated in the dogs being taken. She felt angry and sad when the dogs were taken away.

The touching stopped happening when defendant was no longer living with them. G.S. did not tell her mother immediately.

In December 2018, G.S. was seeing a counselor at her school because she was showing signs of depression. At that time, G.S. was feeling "so numb and exhausted." She tried to hurt herself by cutting herself with a knife, pencil, or ruler, and took a lot of melatonin in an attempt to kill herself. On December 4, she told the counselor that she wanted to kill herself. The counselor was shocked and called her mother. G.S. did not tell her counselor about defendant's abuse, nor had she told her mother at that point.

G.S.'s mother took her to Kaiser hospital's emergency department. She met with a doctor there she had not seen before. She talked with the doctor about stressors in her life, but she did not tell the doctor what had been

4

happening with defendant. G.S. was referred for mental health therapy, and about a week later, started seeing a therapist. G.S. did not tell the therapist immediately about defendant's touching because she was scared.

On December 11, 2018, G.S. finally told her mother about what defendant had been doing. G.S. told her mother about the abuse "[b]ecause I was afraid that I was really going to kill myself if I didn't tell anyone." At the time, G.S. knew defendant was in jail, which made her feel safer from him, and was part of the reason she disclosed the abuse when she did. After defendant moved out, G.S. also told her friend about the abuse though she was not always open with her about what happened.

G.S. testified she was still seeing a therapist and taking medication to manage her depression and anxiety. When asked how the sexual assaults have affected her personally, G.S. testified, "I began to look at myself different and I was very suicidal and I felt like I didn't have any worth anymore, that everyone was going to look at me in a different way." She used to be involved in gymnastics and swimming, but she did not want to participate in gymnastics anymore because she "didn't want to be around men anymore" and "one of the coaches was a man." G.S. also stopped eating to the point where she stopped getting her period and her hair was falling out.

On cross-examination, G.S. testified that defendant lived with them for about seven months from September 2017 to March 2018. She affirmed that defendant started touching her when her older sister moved out of the house.

G.S. heard a lot of yelling and arguing between her mother and defendant that made her scared and angry. She felt angry at defendant because she loved her mother and wanted to protect her from defendant. She also affirmed that when defendant touched her waist and pulled her toward

5

him that she was scared because she thought he was going to hurt her like he was hurting her mother. She told the police that she had told her mother, " 'I knew he was throwing you against the wall.' " She told the police that because it really upset her and brought back a lot of bad memories, even as she testified. G.S. affirmed that it was hard to hear her mother deny the abuse when G.S. was trying to help her, and that she felt "[s]ad and annoyed." She grew to hate defendant because of what he did to her mother. She wanted him to suffer for what he did to her mother, and she was happy and relieved when he moved out.

### 2. B.S.'s Testimony

At trial, B.S., testified that she and defendant began dating around the end of 2016 and dated for two and a half years. Defendant moved in to her home in August 2017, and lived there until March 2018, when her relationship with him ended and he moved out. He moved out because of domestic violence.

When defendant moved in with B.S. and her daughters, G.S.'s older sister lived there, but she moved out around her birthday on October 10. After the sister moved out, B.S. noticed a change in G.S.'s demeanor. She "shut down," and was sad, crying, and stopped participating in gymnastics and swimming. B.S. asked G.S. why, but G.S. responded, " 'I don't know mom.' " G.S. stopped participating in gymnastics and swimming at the end of February, before defendant moved out in March.

In June 2018, an incident occurred between B.S. and defendant that resulted in a criminal case. B.S. reported the incident to the police, the district attorney filed charges, and B.S. was required to come to court to testify. The jury convicted defendant on December 5, 2018. While the jury was deliberating, G.S. was "panicked," "scared," and "suicidal," but B.S. did

6

not know why.  B.S. asked, but G.S. would not tell her.  When defendant was convicted, G.S. was relieved.

On December 3, on the second day of trial, B.S. received a call from G.S.'s school, reporting that she had suicidal ideations.  The school had called "the authorities," and law enforcement accompanied G.S. and her mother to the emergency room at Kaiser Permanente hospital.  They met with a doctor. When the doctor asked G.S. about how long she had been feeling this way and why she believed she felt that way, she would just cry and "had a blank stare."  But G.S. did not report that defendant had been molesting her.

On December 11, G.S. approached her mother and told her she needed to speak with her.  G.S. told B.S. that "she hated herself because this man had molested her and had been fondling his penis, touching it until it was slimy and he would force his fingers in her mouth.  He would grab her from the back and grab her breast and she didn't even have breasts, and just rub her and he would pull her into him and he would tell her to be quiet."  B.S. testified G.S. was "throwing up," "crying," and "couldn't hold herself up."  She said she would "never forget that."

When B.S. asked G.S. why she did not tell her sooner about the abuse, G.S. responded:  " 'Because he was going to kill you, he said.' "  G.S. told her mother she was scared for both of their lives, and for the life of her younger sister.  B.S. also asked G.S. why she would stay in her room if that was where he would touch her, and she told B.S., " 'I didn't want him to touch [my younger sister].' "

When G.S. disclosed the abuse to B.S. on December 11, defendant had already been convicted.  It was B.S.'s understanding that he would be doing some substantial time in jail.  B.S. conveyed that information to G.S.

7

### 3. Multidisciplinary Interview

On December 27, 2018, G.S. was interviewed at the Courage Center in Fairfield by a specially trained interviewer with the district attorney's office, Vicky Rister, in what was termed a multidisciplinary interview (MDI). The MDI was recorded. A redacted version of the MDI was played for the jury at trial, over defense objection.

When Rister asked G.S. in the MDI about the first thing she could remember happening to her, G.S. told her defendant would come into her room when her mother was "cooking, or doing laundry, or, um, even using the bathroom." He told her to shut up, then he touched his penis and then put his fingers in her mouth. When asked how he touched his penis, G.S. said, "He would put his hands in his pants and go like that"; she gestured to show a back-and-forth motion. Asked what his fingers felt or tasted like when he put them in her mouth, she said: "I wouldn't be able to taste it because . . . it was all the way down. It wasn't down my throat, but he wouldn't put it on my tongue. He would put it, like, sort of down my throat basically. Um, and they were slimy." G.S. would cry, try to scream, and try to hit him and push him away to get him to take his fingers out, but he would tell her to shut up and pull her hips so she was not able to move.

G.S. would always try to hit or punch him because she knew it was wrong. She tried to scream but he would put his index finger to his mouth or cover her mouth so she would not say anything. It would last for "like, five minutes." When her mother came close to the door of her room, he would stop, wipe his fingers on his pants, and leave.

The touching always happened on the weekends, never on the weekdays. She did not know how many times it happened. When asked if she remembered how long he lived there before the first incident happened,

8

she responded: "Probably, um, three to five months. I—I really don't know."[1] After the first time, it was "exactly two weeks" before he did it again. Then "he did start to do it every weekend after those two weeks." He would do it for five minutes on Saturday and five minutes on Sunday, every weekend, but never twice a day, and he did the same thing every time. After probably three weeks, when she got her first bra, he would try to squeeze her "breasts that were nonexistent at that time." The last time it happened was the "last weekend he was living there." She did not remember what month that was, but remembered it was at "the beginning of this year."[2]

When asked what caused defendant not to live with them anymore, G.S. gave a lengthy, narrative response covering many subjects and incidents, as follows:

G.S. said she knew her mother did online dating and that was how she met defendant. B.S. would tell G.S. and her sisters, and G.S. "would always hear," that defendant broke four of his ex-wife's ribs.[3] G.S. asked her mother

---

[1] Later in the interview, Rister asked, "[Y]ou said it started a few months after he moved in?" G.S. said that it started "after my two older sisters moved out." She said her sisters moved out because G.S. told them that she felt uncomfortable with defendant.

[2] Later in the interview, G.S. said he moved out in October, around October 4, but corrected herself to say he moved out in the beginning of 2018.

[3] On cross-examination at trial, defense counsel asked G.S. if she remembered "telling the police that [B.S.] told you something that Mr. Silva did to his previous wife?" G.S. responded, "Yes." Defense counsel then asked her *when* that happened, and G.S. said she "overheard" that "[a]fter they had broken up." During redirect questioning, the prosecution asked her, "[Y]ou had heard about an incident involving the defendant and his ex-wife, correct?," to which G.S. responded, "Yes." The prosecutor then asked: "This incident that I'm talking about that we have not yet talked about it in detail you only learn brain damage that [*sic*] after the molest ended?" G.S. responded, "Yes."

why she would want to be " 'with this man?' " and her mother would "always" tell her it was not her business.  She also saw bruises on her mother, and when she would ask her mother who hit her, her mother would say she hit herself by accident.  But G.S. knew defendant was hitting her because every night she would hear "like, a big smash on the wall" and would hear her mother crying.

G.S. said that the "time before" the last time, defendant and her mother were fighting and G.S. said, " 'I'm gonna call the cops.' "  Her mother said "no," and then they talked at the table.  Defendant took away her dogs, which were a big part of her life.  G.S. said: "My dogs were, um, a big part of my life because, this sounds really dumb, but I would talk to my dogs and I would tell 'em everything.  And, um, he took those away and I wasn't able to see my sisters, because at that time—because, um, they didn't like him.  Because they knew that he was hitting her.  And, um, so we weren't able to see them at that time.  And, um, I wasn't able to see half of my family because of him. And he took away two of my best dogs that I've ever had."[4]  That day, G.S. told them, " 'You took away everything from me.  You—you took away half of my childhood.' "  When her mother asked her how, defendant gave her a look[5] and G.S. said, " 'Nothing mom.  He didn't take away half of my childhood mom.' "

G.S. then explained that "the last time" when defendant was hitting her mother, her mother had been sleeping in her little sister's room and defendant had been sleeping in her mother's bed.  Defendant came out and started banging on the door.  Her mother came out and then G.S. heard

---

[4] G.S. later said the dogs went to her mother's friend's house and she is not able to see them now.

[5] G.S. understood the look he gave her to mean "Don't tell anyone."

defendant hitting her mother. She covered her little sister's ears. Her mother told her to call the cops, but she could not because defendant had taken her cell phone away.[6] Her body froze, she couldn't move her legs, and she couldn't get up at all. Then G.S. heard defendant "punch[] [B.S.] so hard on the ground." G.S. said she started to cry and B.S.'s "head started bleeding from the ground and he kicked her car." After that, her mother said, "[H]e is never gonna live here no more." G.S. did not believe her mother because they had fought so many times before and she still did not leave him. G.S. said: "I felt like it was never gonna be over. So, um, the last time that he did it . . . . I would just stay there because I was over . . . trying to fight." She stopped trying to hit defendant because she was "over it." She said: "And I just let him to do it. And, basically I was his sex doll. And, um, I would just stand there and let him do it until my mom came, because I was tired of trying to move." G.S. said she hated defendant, and she told him, " 'I hate you.' " She apologized for "talking a lot," but Rister told her it was okay.

G.S. then explained that talking to the therapists at Kaiser does not help her, and that she would just tell her mother she was fine, but after that would feel "an overwhelming sadness," and though she tried to act happy, she was "really just like, not okay inside."

G.S. did not tell anyone while the touching was happening. She was really depressed about defendant, not telling anyone, and always keeping things to herself. She tried to talk to her friends, but she could not talk to them about what was happening and drifted apart from her best friend because she could not tell her. She started cutting herself but not "fully" and

---

[6] Later in the interview, G.S. said defendant took her phone because "he didn't want us to call the cops."

11

she "didn't end up bleeding." She "just wanted to die at that time" and "didn't wanna deal with it."

She finally talked to her mother about what had happened on the 11th of December. She told her mother because she was tired of not telling anyone. G.S. also told Rister she waited a year to tell her mother because she was scared defendant was going to do something to her family. Further, she said that "[w]hat he did to me sort of caused me to be afraid." She was "thinking that he was gonna do something. And I told my mom at this time because I knew that he was in jail for five to six years, and I knew that he wasn't gonna be able to do anything." G.S. told Rister defendant was in jail because "he hit my mom."

When she told her mother, G.S. told her she needed to tell her something, then started crying. She said: "And I didn't wanna tell her at all. And I told her everything that I just told you. And, um, she started to cry. And she told me, 'I'm so sorry and I hope you forgive me because I let this happen, and I didn't listen to you when you said to leave him.' 'Cause I would always tell her why—you need to leave him mom He's not right in the head. And the last time they fought, um, and he hit her a lot. He screamed at my mom and I heard this too, 'I should have just raped your daughters.' And um, that really, like, hurt me a lot too, because, um, he—he didn't rape me, but he touched me sexually, and, um, and, um, I just feel like if he did rape me then I probably wouldn't be alive right now because I was so hurt at that time. And being raped would hurt me even more."[7]

Rister asked G.S. to tell her more about "wanting to die." G.S. explained that she "didn't wanna feel the feelings that I feel and felt." She

_____

[7] At trial, G.S. denied ever hearing defendant saying anything to her mother about rape.

couldn't tell anyone because she thought defendant would "kill me and my family if I tell anyone. . . . if I tell anyone he's gonna kill me. So I'd rather just kill myself." When asked why she thought he would kill her, G.S. said, "Because he was really sick in the head. He would always tell my mom, 'I'm gonna kill you. I'm gonna kill you.' And he said—he told my mom that he was gonna kill us."

Toward the end of the interview, Rister asked G.S. how long she had been seeing a counselor. G.S. responded that there was "this boy" and "they" kept telling G.S. that she liked him and he liked her "and stuff." And G.S. said, "[N]o, he looks like a fish out of water. And then he said, um, your vagina looks like a pepperoni pizza and stuff like that." After that, she began talking with a counselor at school, and then she started seeing a therapist.

Rister asked G.S. about her statement earlier in the interview that defendant took "everything away" from her, and asked what she meant by "everything." G.S. said, "my happiness, . . . my dog and my sisters."

When Rister asked G.S. further clarifying questions about the timing of the abuse, G.S. told her that defendant went to jail on October 4, got out of jail and moved back into their house, then left their house at the beginning of 2018, and was now back in jail. G.S. mentioned that she thought her mother had bailed defendant out of jail. She also told Rister that defendant's brother "just went to jail for his whole entire life" because he had "raped the 10 year old."

Rister then asked G.S. what grade she was in when defendant moved out for the last time. She responded, "It was summer. I was going into sixth grade, but I wasn't in sixth grade yet. It was summer." Rister asked, "So the last time . . . he touched you was at the beginning of the year?" and G.S. responded, "Mm-hm." She told Rister "what caused him to stop touching me,

13

was him not living there no more." Rister then asked, "[B]etween . . . the beginning of the year and the summer time, did he not live there part of the time?" and G.S. responded, "No. He lived there all the time." She then affirmed that the last time he touched her was right before he moved out for the very last time. Rister asked G.S. whether her mother would know "the dates and months" of "when he lived there, when he left, when he got arrested, when he moved out, when he moved back in," to which G.S. responded, "I don't know."

## B. Procedural Background

On October 30, 2018, the Solano County District Attorney filed an information charging defendant with one count of felony criminal threats (Pen. Code,[8] § 422; count 1) and one count of misdemeanor annoying phone calls (§ 653m, subd. (a); count 2). A jury trial commenced on December 3, 2018, and defendant was found guilty on both counts.

Before defendant could be sentenced, on January 9, 2019, a felony complaint was filed against defendant charging defendant with multiple counts of forcible lewd acts on a child, pursuant to section 288, subdivision (b)(1) and one count of continuous sexual abuse of a child pursuant to section 288.5, subdivision (a). Defendant was held to answer as to all counts and an information was filed on June 19, 2019. A jury trial began on July 6, 2021. On the first day of trial, an amended information was filed, alleging 11 counts of forcible lewd act on a child at the following times: October 14–31, 2017 (count 1); November 1–15, 2017 (count 2); November 16–30, 2017 (count 3); December 1–15, 2017 (count 4); December 16–31, 2017 (count 5); January 1–15, 2018 (count 6); January 16–31, 2018 (count 7);

---

[8] All statutory references are to the Penal Code unless otherwise indicated.

14

February 1–15, 2018 (count 8); February 16–28, 2018 (count 9); March 1–15, 2018 (count 10); and March 16–31, 2018 (count 11). On July 7, 2021, the jury found defendant guilty of all 11 counts.

The trial court sentenced defendant to eight years, representing the midterm, as to count 1 in the sex case, plus 10 full-term consecutive eight-year terms for counts 2 through 11, for a total sentence of 88 years in state prison. For the criminal threats case, the court imposed the midterm of two years for the violation of section 422, and six months for the violation of section 653m, to run concurrently with the sentence imposed in the sex case. Defendant timely appealed from both cases.

## II. DISCUSSION

Defendant raises several challenges to the judgment. First, he contends the evidence was insufficient to support all but two of the lewd acts convictions because the evidence does not permit a rational inference that defendant touched G.S. on the dates alleged. Second, he argues the trial court abused its discretion in admitting the MDI recording and allowing it to be played to the jury. Finally, defendant contends the trial court abused its discretion in allowing the jury to hear a substantial amount of evidence that was more prejudicial than probative, inadmissible hearsay, or constituted improper appeals to the jury's sympathy, and that the cumulative effect of all such evidence amounted to a violation of his due process right to a fair trial.

### A. Substantial Evidence

Defendant was charged with 11 counts of violating section 288, subdivision (b)(1), with the first act allegedly occurring "[o]n or about and between October 14, 2017 and October 31, 2017" (count 1) and the remaining 10 acts occurring twice a month thereafter, through the end of March 2018; once between the first and 15th day of each month, and once during the 16th

15

day and the last day of the month (counts 2–11). Defendant contends the evidence is insufficient to prove that the molestations began in October 2017, as alleged in count 1, or even November, December, or January, as alleged in counts 2 through 7. He also contends the evidence is insufficient to show that they continued through the end of March 2018, as alleged in counts 10 and 11.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence no reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).)

Defendant first contends the evidence is insufficient to support his convictions for counts 1 through 7 because it does not show that the alleged molestations began as early as October 2017 or any time before February 2018. Defendant relies on (1) G.S.'s trial testimony that defendant began touching her "after" her sister moved out; (2) G.S.'s MDI statements that the molestations began "[p]robably" three to five months after he moved in but she really did not know; and (3) B.S.'s trial testimony that defendant moved

16

in with them in August 2017.[9] Defendant argues that G.S.'s statement that defendant started molesting her at some unspecified time "after" her sister moved out does not establish that he began *when* (or even right after) her sister moved out. Further, assuming that defendant moved in in August 2017 as B.S. testified, G.S.'s MDI statement that the abuse "probably" began "three or five months" after defendant moved in would place the beginning of the molestation sometime between November and February, but the jury cannot speculate about when it began.

Defendant further contends that the evidence the molestation began as early as three months after defendant moved in is not substantial because G.S. only said it was "[p]robably" between three to five months after he moved in, but she *did not know*. Defendant emphasizes there was no other evidence about when the molestations began except that it was some unspecified length of time after the sister moved out on October 10. Finally, defendant argues there was no solid evidence about how many months the molestation lasted because G.S. said only that it was exactly two weeks between the first and second time that defendant touched her, and after that it was once every Saturday and Sunday until he moved out. G.S. did not recall how many times it happened, but it was multiple times—more than a few times. Defendant notes that at trial, when asked how long the touching lasted, G.S. "cryptically" testified, "Um, until my sister moved out, until . . . the first time he went to jail."

Accordingly, defendant asserts, even viewing the evidence in the light most favorable to the prosecution, the "only reasonable and solid evidence

---

[9] Defendant notes that G.S. testified defendant moved in with them in September 2017 but concedes it is appropriate to use mother's date (i.e., August 2017) because we must view the evidence in the light most favorable to the prosecution.

regarding the time period of the alleged molest[ations] is that they started at some unspecified time after October 10, 2017, there were multiple incidents, and they occurred every Saturday and Sunday, starting two weeks from the first time. The most that can be reasonably inferred from this is that the molest[ations] began in February, 2018 since that date is after October 10, 2017, and since there would have been multiple incidents in February and March, assuming they occurred every Saturday and Sunday, and assuming they lasted until March."

We disagree. Count 1 charged that defendant committed the first lewd act between October 14 and 31, 2017. Contrary to defendant's argument that there was no substantial evidence as to when the molestation began, G.S. testified that her relationship with defendant changed after her older sister moved out because "[t]hings in the house started getting more violent and he started touching me." On cross-examination, G.S. agreed that her older sister moved out sometime after defendant moved in. Defense counsel specifically asked G.S., "And you said that this all started *when* [your older sister] moved out?" (Italics added.) G.S. responded, "Yes." B.S. testified that G.S.'s sister moved out on October 10, 2017. At the MDI, G.S. said defendant touched her for the second time exactly two weeks after the first time, and every weekend after those two weeks, on Saturday and Sunday, until the last weekend he was living there. At trial, G.S. confirmed defendant touched her "[o]nce every day" on the weekends, on Saturday and then again on Sunday. B.S. also testified that G.S.'s demeanor changed after her older sister moved out: that G.S. "shut down," that she was "sad" and "crying," and that she stopped participating in gymnastics and swimming.

October 10, 2017 was a Tuesday, the first weekend day after that day was Saturday, October 14; two weeks later was Saturday, October 28.[10] In light of G.S.'s affirmation that the abuse started *when* her older sister moved out and her testimony that defendant always touched her on weekends and never on weekdays, the evidence supports a reasonable inference that her older sister moved out on October 10, that defendant first molested G.S. on October 14 (the first Saturday after her older sister moved out), and again two weeks later on October 28. Accordingly, the evidence was sufficient to prove that defendant molested G.S. at least once between October 14 and October 31, 2017, as alleged in count 1.

Further, as discussed above, G.S.'s testimony at trial and statements in the MDI show that defendant touched her for the second time exactly two weeks after the first time, and every weekend after those two weeks, on Saturdays and Sundays, until the last weekend he was living there. B.S. testified that defendant lived with them from August 2017 to March 2018. Taken together and construed in the light most favorable to the prosecution, G.S.'s and B.S.'s testimony amply supports the jury's findings of guilt on counts 2 through 9, reflecting that defendant molested G.S. at least once during the first half and at least once during the second half of every month between November 2017 and February 2018. (See, e.g., *People v. Jones* (1990) 51 Cal.3d 294, 316 [in child molestation cases, generic testimony describing the kind of act or acts committed, number of acts "(e.g., 'twice a month' or 'every time we went camping')," and general time period within which they occurred is sufficient to sustain conviction].)

---

[10] We take judicial notice of the 2017 and 2018 calendars. (Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

19

Defendant also challenges his convictions on counts 10 and 11, arguing the evidence is insufficient to show the molestations continued through March 2018. Count 10 alleged that defendant committed a lewd act between March 1 and 15, 2018, while count 11 alleged defendant committed a lewd act between March 16 and 31, 2018. G.S. testified at trial that defendant's touching stopped when he did not live with them anymore. She also affirmed, in response to a question from defense counsel, that defendant lived with them from September 2017 to March 2018. In her MDI, she affirmed that defendant touched her for the last time in the "beginning" of 2018, but she also said that the last time he touched her was the last weekend he was living there, which she said was in the summer before she went into sixth grade. B.S. testified defendant lived with them until March 2018. Defendant contends that regardless of G.S.'s conflicting statements, and even crediting B.S.'s testimony he moved out in March, the jury could only speculate about *when* in March defendant moved out and, thus, when he last molested G.S.

As the Attorney General points out, however, at the MDI, G.S. stated that defendant moved out in the summer before she entered sixth grade. At trial, G.S. testified she was in sixth grade in December 2018. At the MDI, she also stated that the last time defendant molested her was "[t]he last weekend he was living there," and she confirmed that "[h]e lived there all the time" from the beginning of the year until the summer. It is well established that "[t]he testimony of a single witness can be sufficient to uphold a conviction—even when there is significant countervailing evidence, or the testimony is subject to justifiable suspicion." (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1158 (*Valenti*); *People v. Shirley* (1982) 31 Cal.3d 18, 70 [even vague and self-contradictory evidence can be substantial evidence sufficient to support a guilty verdict].) Because we must presume the jury

20

resolved any conflicts in the evidence in support of the verdict, the jury could have concluded that defendant moved out in the summer of 2018, that the molestations continued until the weekend before he moved out, and thus could have found that he molested G.S. twice in March 2018.

Defendant argues this case is like *People v Mejia* (2007) 155 Cal.App.4th 86 (*Mejia*) and *Valenti, supra*, 243 Cal.App.4th 1140, but those cases, which involved convictions for continuous sexual abuse of a child, are distinguishable. In *Mejia,* the defendant was charged with committing sexual abuse of a child " 'on or between June 1, 2004 and September 17, 2004,' " but the evidence showed only that the abuse began at some point in June and continued to some point in September. (*Mejia,* at pp. 93–95.) Under section 288.5, subdivision (a), the prosecution had to prove there were three or more incidents of abuse and that at least three months elapsed between the first and third incidents. (§ 288.5, subd. (a); *Mejia,* at p. 94.) Because "the only reasonable inference permitted by the evidence was that defendant's abuse began sometime in June and continued to some date in September—but the jury could only speculate that the first incident occurred early enough in June to satisfy the 90-day requirement expiring on September 17, 2004," the evidence was insufficient to support the conviction. (*Mejia* at p. 95.) Similarly, in *Valenti*, the appellate court reversed the defendant's conviction under section 288.5, because the evidence of when the abuse started was not specific enough to support an inference it began at least 90 days before the final incident, and in fact, "the court's careful questioning of [the victim] elicited unequivocal testimony that the abuse did not last for more than one month." (*Valenti,* at pp. 1158–1160.) Thus, in both *Mejia* and *Valenti* there was *no evidence* that the minimum three-month

time period element of the continuous sexual abuse of a child offense was satisfied.

Here, by contrast, there is evidence from which a jury could conclude defendant lived with G.S. and her mother until the summer of 2018, that he last touched her on the weekend before he moved out, and that he therefore touched her at least once in the beginning of March and once in the second half of March. Defendant essentially asks us to credit trial testimony that defendant moved out in March 2018 over G.S.'s MDI statements, but we cannot resolve questions of credibility or conflicts in the evidence on appeal.[11] (See, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 143 [judgment may not be reversed simply because circumstances might be reconciled with contrary finding]; *People v. Ennis* (2010) 190 Cal.App.4th 721, 725 [" 'inherently improbable' " standard for rejecting testimony on appeal "means that the challenged evidence is 'unbelievable per se' (italics omitted), such that 'the things testified to would not seem possible' "; such a determination cannot be made by comparing challenged testimony to other evidence in the case].)

Defendant also relies on a principle articulated in *People v. Brown* (1989) 216 Cal.App.3d 596, 600, and *People v. Allen* (1985) 165 Cal.App.3d

---

[11] Indeed, a different portion of the *Mejia* opinion, not discussed by defendant, supports the judgment here. In *Mejia*, the defendant was also convicted of two acts of molestation that occurred in the month of October 2004. The victim, who provided the only evidence in support of the charges, contradicted herself about whether the defendant had abused her once or twice in October, and when asked directly to state the number of times defendant had molested her in October she said: " 'I don't really remember much of October.' " (*Mejia, supra*, 155 Cal.App.4th at p. 98.) The defendant argued the victim's testimony was "so self-contradictory that it cannot be deemed sufficient evidence under the federal Constitution's due process standard." (*Ibid.*) The appellate court disagreed, however, concluding sufficient evidence supported both convictions, because "the contradictions in her testimony merely raised a credibility issue for the jury to resolve." (*Ibid.*)

616, 626, that when proven facts give equal support to two competing inferences, neither inference is established. But those cases are distinguishable because, like *Mejia* and *Valenti*, they concern lack of evidence of an element of the crime resulting in speculation, not, as here, a conflict in reasonable inferences drawn from the evidence. In *Brown*, the defendant's conviction for evading police pursuit under Vehicle Code section 2800.1 required proof the police officer had activated the red lights on her vehicle. The officer's testimony that she " 'activated [her] overhead signals' " but did not recall if they were in the position to activate her red lights was deemed insufficient evidence to prove she had activated the red lights. (*Brown*, at pp. 599–600.) Because there was no evidence about the color of her lights, there was a lack of evidence about an essential element of the crime. (*Id.* at p. 600.) Similarly, in *Allen*, evidence that either the defendant or his accomplice had fired a gun was insufficient to prove that the defendant had personally used a weapon because who used the gun was purely a matter of conjecture. (*Allen*, at p. 626.) Here, the problem is not that there was *no evidence* about when defendant moved out such that the jury would have to speculate, but the evidence was in conflict as to whether he moved out in the "beginning" of 2018, in March 2018, or in the summer of 2018. Because G.S.'s statements during the MDI allowed the jury to draw a reasonable inference that defendant moved out in summer and continued his abuse throughout March 2018, we conclude his convictions on counts 10 and 11 are supported by substantial evidence.

## B. *Admission of the MDI Recording*

Defendant next argues that the trial court erred in admitting the MDI recording as evidence at trial because G.S.'s statements in the interview were

rambling, nonresponsive, inconsistent on key points, and accordingly, not reliable.

Under Evidence Code section 1360, "[i]n a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse . . . is not made inadmissible by the hearsay rule" if the court finds in a hearing conducted outside the presence of the jury that the "time, content, and circumstances of the statement provide sufficient indicia of reliability," the statement is not otherwise inadmissible by statute or court rule, and the child testifies at the proceedings or is unavailable but other evidence corroborates the abuse. (*Id.*, subd. (a).) We review the admission of evidence under section 1360 for abuse of discretion. (*People v. Mitchell* (2020) 46 Cal.App.5th 919, 927; *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1329–1330 (*Brodit*).)

As an initial matter, by failing to assert a specific objection that the MDI recording was inadmissible because G.S.'s statements were unreliable, defendant has forfeited that contention on appeal. (Evid. Code, § 353, subd. (a) [no reversal on appeal absent timely and specific objection to erroneous admission of evidence in trial court]; *People v. Landry* (2016) 2 Cal.5th 52, 86 [failure to object in trial court to erroneous admission of evidence based on grounds raised on appeal forfeits claim of error].) Though defense counsel objected multiple times to the MDI recording, he objected on the grounds that statements in the MDI were more prejudicial than probative under Evidence Code section 352 and that the interview unfairly bolstered G.S.'s credibility.[12] At one point, defense counsel asserted an objection that

---

[12] Indeed, when the judge asked why he would allow the prosecution to play the video if the victim were also testifying, the prosecution told the court it was "standard fare" for sexual assault cases where the victim is under 12

24

there was "[n]o legal basis" for admitting the interview, but made no argument that the recording was inadmissible because G.S.'s statements were unreliable. Accordingly, the argument is forfeited.

In any event, we reject on the merits defendant's claim that the trial court abused its discretion. In assessing the reliability of hearsay statements by child witnesses in sexual abuse cases, courts consider a nonexhaustive list of factors, including (1) spontaneity and consistent repetition, (2) mental state of the declarant, (3) use of terminology unexpected of a child of a similar age, and (4) lack of motive to fabricate. (*Brodit*, *supra*, 61 Cal.App.4th at p. 1330; see *In re Cindy L.* (1997) 17 Cal.4th 15, 29–30 [adopting same nonexclusive factors in connection with analogous child dependency hearsay exception].) Courts may also consider the ability of the child to understand the duty to tell the truth and distinguish between truth and falsity. (*Cindy L.*, at p. 30.)

The trial court did not abuse its discretion by finding that G.S.'s statements in the MDI recording had sufficient indicia of reliability and admitting the interview into evidence. As to spontaneity and repetition, G.S. was interviewed shortly after first reporting the abuse in a noncoercive environment by an investigator specializing in interviewing child witnesses, who used nonleading, open-ended questions. During the entire interview,

---

"as long as the Court doesn't find anything unreliable or untrustworthy about her statement," and reiterated that the court "needs to find that the statement has some sort of indicia of reliability." Defense counsel did not argue that G.S.'s statements were unreliable, but only that the context of the MDI takes place in "a special room where . . . it's somehow more reliable than what they're going to hear and see at trial because it's . . . special" and that "there's some aura of special credibility that an MDIC interview gets out that they won't be hearing themselves . . . ."

Rister only discussed matters of a sexual nature after G.S. had already raised them, and asked follow-up questions to draw out additional details from G.S.

G.S.'s descriptions of defendant's molestations repeated throughout the interview were internally consistent and consistent with what she reported to her mother. G.S. explained that defendant would grab her by the hips, pull her to him so she could not move, touch her breasts, and touch his penis using an up-and-down motion and then put his fingers in her mouth. She said the molestations were basically the same every time with small variations, happened every Saturday and Sunday in her room, and were interrupted when her mother approached the room. While some statements in the interview were inconsistent or confusing, viewed as a whole they were sufficiently clear and consistent that the court could reasonably find them reliable. Nor was there anything in the interview tape to suggest that G.S.'s mental state was compromised or rendered her statements unreliable.

Defendant argues that G.S. "clearly had a motive to fabricate" because she hated defendant for his abuse of her mother and wanted him out of her life. But at the time of the interview, defendant was already out of G.S.'s life because he had been convicted, was in custody, and G.S. understood he was going to jail for "five to six years," which, she explained, was the reason she felt she could finally report the abuse. Moreover, at the beginning of the MDI, G.S. demonstrated that she understood the difference between the truth and a lie, and was instructed by Rister that the "most important thing in this room is that we only tell the truth." (See, e.g. *People v. Eccleston* (2001) 89 Cal.App.4th 436, 446–447 [videotape of interview with child abuse victim had indicia of reliability where, among other things, victim understood difference between truth and falsehood].)

Defendant also complains that the trial court failed to hold a hearing to determine G.S.'s competency to testify, her cognitive abilities, or her tendency to tell the truth. But again, defendant did not object on these grounds in the trial court. In any event, the trial court expressly stated on the record several times that it would "bone up" on Evidence Code section 1360, reflecting that the trial court reviewed and understood the requirement that it find the "time, content, and circumstances of the statement provide sufficient indicia of reliability." (Evid. Code, § 1360, subd. (a)(2).) The judge also promised to view the entire MDI recording, which he did. After watching the whole video, he explained on the record that he found G.S. a "compelling, sympathetic witness," and discussed at length and in great detail with counsel for the parties the arguments for admitting or excluding many particular statements to which defense counsel objected. Although the court expressed concerns about some of the statements in the video,[13] his comments after watching the video and hearing G.S. testify indicate that he gained a nuanced understanding of the reliability of her statements and the relevance and probative value of the video. Accordingly, we presume the trial court was aware of the relevant indicia of reliability under Evidence Code

---

[13] Defendant points specifically to comments from the trial court indicating that the court acknowledged about "a half dozen different things in this child's life that are detailed in this recording that all have to do with the manipulation of the situation in regards to physical things the child wants," some "really weird thing" like someone "describing her vagina as looking like a pizza," and "substantial portions" of her testimony reflecting inconsistency as to whether fear was a motivation for her delayed reporting. First, the court was making the first two comments in the context of discussing whether to allow Dr. Anika Butterfly to testify for the defense, a decision not challenged on appeal. Second, the judge also indicated that the defense could use the inconsistencies in the MDI to cross-examine G.S., and that he found her a compelling witness after watching the interview in its entirety.

27

section 1360 and concluded the MDI recording was sufficiently reliable. (Evidence Code, § 664.) Based on the totality of the circumstances, for all of the reasons discussed above, that determination was not an abuse of discretion.

## C. Evidentiary Challenges

Defendant raises many specific challenges to statements by G.S. and B.S. in their testimony at trial and by G.S. in the MDI recording, contending they were erroneously admitted because they were more prejudicial than probative, inadmissible hearsay, or constituted improper appeals to the jury's sympathy. Defendant argues the evidence is basically divided into four categories: (1) evidence that defendant had been convicted by a jury of hitting B.S. in a prior case and had been sentenced to a lengthy jail term, (2) evidence of other bad acts by defendant, (3) hearsay statements, and (4) evidence and argument that improperly appealed to the jury's passion by eliciting sympathy for G.S. or painting defendant in a bad light. Defendant contends all of this improperly admitted evidence should have been excluded under Evidence Code sections 352 and 1101.

### 1. Standard of Review

On appeal, we review the trial court's decision to admit prior uncharged acts under Evidence Code section 1101 or evidence subject to an Evidence Code section 352 analysis for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1271, 1237.) "We review a trial court's decision to admit or exclude evidence 'for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.' [Citation.] When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would

have occurred absent the error." (*People v. Powell* (2018) 5 Cal.5th 921, 951, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### 2. *Domestic Violence, Conviction, and Jail Term Evidence*

Defendant first argues that the trial court erred in allowing the jury to hear that defendant was convicted by a jury of hitting B.S. and had been sentenced to a lengthy jail term.

Before trial, the prosecution brought a motion in limine to introduce evidence of defendant's custodial status at the time G.S. disclosed the abuse, while defense counsel argued such evidence should be excluded. The prosecutor argued the evidence was relevant to explain why G.S. disclosed the molestations when she did—because she felt safe knowing defendant was in jail. The trial court observed it "corroborates her explanation as to her reason why she delayed" and should be admitted because to exclude it would be unfair to the prosecution and might allow the jury to "speculate whether or not she's fantasizing all this up." Nonetheless, the court remarked the evidence should be sanitized, suggested the parties might stipulate to the relevant dates, and said it was "inclined to give some sort of limiting instruction, if need be."

When defense counsel later brought a motion to exclude "any mention" of defendant's trial in the criminal threats case and the fact of his conviction, the trial court again noted defendant's custody status was relevant to the delayed disclosure. Although the court concluded defendant's conviction was admissible, the court suggested the language might be sanitized to avoid references to the idea of jury deliberations or a verdict because that was "just not necessary or relevant." The prosecutor then argued that he did not "even care about the actual conviction part because that's just saying he was convicted of a crime," but the important fact was "when the jury came back,"

i.e., shortly before G.S. reported the molestations. The court suggested the parties "work out a stipulation" and told them if they could not, he would revisit the issue.

With respect to the MDI recording, the court held a discussion with the parties regarding the admissibility of G.S.'s statements that defendant was going to jail for five or six years and that he was in jail for hitting her mother. The court reiterated that the statements were relevant to G.S.'s state of mind. Noting she was "technically incorrect" about why he was in custody, the court suggested that was a "little issue[ ] that that I guess we would have to address somehow."

The parties subsequently stipulated that defendant was arrested on October 4, 2018, and convicted on December 5, 2018. The court said it would not use the word "verdict" but rather " 'convicted' " or possibly " 'found guilty.' " The court instructed the jury before deliberations that the parties had stipulated to the following: "That on October 4th of 2018, that Mr. Silva was arrested on an arrest warrant and taken to jail. And then on December 5th of 2018, he was convicted of an offense. So those two dates are relevant when you think about the witness and what they said as to what happened when."

As detailed in the factual background above, B.S. testified at trial that an incident between her and defendant in June 2018 resulted in a criminal case, that she testified at his trial, and that a jury convicted defendant in December 2018. B.S then explained that while the jury was deliberating, G.S. was "panicked," "scared," and "suicidal," but B.S. did not know why; after defendant was convicted on December 5, 2018, G.S. was relieved. B.S. testified she understood defendant would do "substantial time" in jail and

30

conveyed that to G.S. G.S. told her mother about the abuse less than a week after defendant was convicted.

G.S. reported to Rister in the MDI that she told her mother about the abuse when she did "because I knew that he was in jail for five to six years, and I knew that he wasn't gonna be able to do anything." When Rister asked G.S. why defendant was in jail, she said, "Because . . . he hit my mom." G.S. also said that at one point, B.S. bailed defendant out of jail but he "then he was still hitting" her.

At trial, the prosecutor asked G.S. why she finally told her mother about the abuse "after all those months." G.S. responded, "Because I was afraid that I was really going to kill myself if I didn't tell anyone." In response to leading questions, G.S. affirmed that when she told her mother, she understood defendant was in jail, that made her feel safer, and it was part of her reason for disclosing the abuse at that time.

Defendant argues the trial court abused its discretion in admitting this evidence because the fact that defendant had been convicted and was in custody had "minimal probative value." Defendant emphasizes that G.S. offered a different reason at trial for making her disclosures in December—namely, that she was afraid she was going to kill herself if she did not tell someone. Her testimony that she also felt safer with defendant in jail was offered only in response to leading questions by the prosecutor and was cumulative. Moreover, defendant contends the additional evidence that he was subject to a five- to six-year jail term, was in jail for hitting B.S., that B.S. bailed him out of jail and he continued to hit her, that B.S. reported him to the police resulting in a criminal case, that B.S. testified, that a jury had convicted him, and that B.S. understood he was subject to "substantial time

31

in jail" served only to convey defendant was a bad person who had been convicted of a serious crime against B.S.

We disagree. As our Supreme Court has explained, "when the victim of an alleged sexual offense did not make a prompt complaint but instead disclosed the alleged incident only some time later, evidence of the fact and circumstances surrounding the delayed complaint . . . may be relevant to the jury's evaluation of the likelihood that the offense did or did not occur." (*People v. Brown* (1994) 8 Cal.4th 746, 761.) Here, the evidence showed that defendant's abuse of G.S. stopped when he moved out, months before she disclosed his abuse for the first time in December 2018. B.S.'s testimony that G.S. was "panicked," "scared," and "suicidal" during the jury deliberations, was relieved after the verdict, and finally disclosed the abuse after B.S. told her defendant would be in jail for a substantial amount of time, helps explain why G.S. made the disclosure when she did and lends support to the prosecution theory that she failed to disclose earlier because she was scared of defendant. That G.S. *also* disclosed the abuse to her mother because she was afraid she would kill herself does not render cumulative the testimony that she felt safer disclosing because defendant was in jail. It is not difficult to conceive that both factors would motivate G.S. to disclose the abuse when she did.

Although defendant is correct that G.S.'s MDI statement that defendant was in jail because he "hit my mom" was not true, the statement was relevant and admissible not for its truth, but as evidence of G.S.'s state of mind. Moreover, the trial court acknowledged G.S. was "technically incorrect about why he's in jail" and suggested the inaccuracy might have to

32

be addressed, but we do not see any indication in the record that defense counsel pursued such an instruction or advisement to that effect.[14]

In any event, the court instructed the jury that G.S.'s testimony about defendant's acts of violence against B.S. could not be used as propensity or character evidence as follows: "Now, during this trial, I allowed certain evidence to be admitted for a limited purpose. You can consider that evidence only for that purpose and for no other. [¶] Now, specifically you heard [G.S.] testify regarding allegations that Mr. Silva had committed acts of domestic violence against [B.S] or others. Now that evidence was allowed in order for you to understand [G.S.'s] state of mind and/or her fear. You cannot consider it as character evidence against Mr. Silva or evidence that Mr. Silva had a propensity to commit the crimes that he's accused of committing here." We presume the jury followed this instruction.[15] (*Covarrubias*, *supra*, 1 Cal.5th at p. 887.)

---

[14] Indeed, defense counsel appears to have tried to use the inaccuracy to his advantage during his closing argument. Noting that G.S. "testified to witnessing some very intense domestic violence inflicted on her mother," counsel argued, "We heard from her mother who confirmed that was happening. *In fact, Mr. Silva was convicted in a separate case for what happened in that case*." (Italics added.) Counsel then argued that G.S.'s desire to protect her mother from defendant's abusive behavior motivated her to fabricate the molestations.

[15] Defendant argues the instruction only applied to G.S.'s testimony but not her MDI statements. While the language of the instruction does use the word " 'testimony,' " defense counsel was invited to draft this admonition to the jury and approved the language eventually adopted by the court. (See, e.g., *Covarubbias, supra,* 1 Cal.5th at p. 901 [party may not complain on appeal that instruction is too general or incomplete unless party requested appropriate clarifying or amplifying language].) Moreover, counsel had requested the instruction to cure the prejudice from G.S.'s statement *at the MDI* that she heard defendant broke his ex-wife's ribs and the court recognized on the record the instruction would be about "limiting some of the

In sum, we agree with the trial court that the evidence from G.S.'s MDI and G.S.'s and B.S.'s trial testimony about defendant's conviction and custody status was highly probative with regard to the circumstances and timing of G.S.'s disclosure of the molestations. The trial court did not abuse its discretion in admitting the evidence.

Defendant also challenges evidence that defendant committed acts of domestic violence against B.S., and that he "vandalized her car." At trial, G.S. testified that she heard defendant "throwing my mom in the closet and sometimes they would argue and he would hit her really bad," but she did not see the hitting. She also testified that her mother would deny the abuse but G.S. did not believe her denials. In the MDI, G.S. said she knew defendant was hitting B.S. because she would hear "a big smash on the wall" and hear her mother crying. G.S. said one time when she was in her room with her little sister, "he punched her [(B.S.)] so hard on the ground and I heard that. And I started to cry and . . . her head started bleeding from the ground and he kicked her car." Defendant argues the admission of this evidence was unnecessary and cumulative because other evidence, including defendant's

_____

evidence that came in *through her statement* about Mr. Silva's alleged bad conduct." (Italics added.) It thus appears that both counsel and the court viewed the instruction as applying to the MDI recording, and it is unlikely the jury would have distinguished between her in-court testimony and the recorded MDI statement in this regard. (See, e.g., *Boyde v. California* (1990) 494 U.S. 370, 380–381 ["Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might."].) While defendant appears to suggest that the court's statement to the jury that it could rewatch the MDI statement during the deliberations further prejudiced him, defense counsel *had already* urged the jury (in his closing argument) to watch the MDI statement again during deliberations to observe G.S.'s demeanor when discussing the domestic violence against her mother.

threats to kill her mother if G.S. disclosed the abuse, were sufficient to prove force, fear, or duress for purposes of the section 288, subdivision (b) offenses.

We reject defendant's argument that the trial court abused its discretion in allowing the evidence. The trial court held extensive discussions with the parties regarding the admissibility of domestic violence evidence. The court expressed concern about the admissibility of such evidence and its potential impact on the jury, particularly to the extent G.S. was speculating about what she heard rather than saw with regard to defendant hitting B.S. At the same time, the court acknowledged that evidence about what G.S. observed, heard, and thought about what she perceived was all relevant to her state of mind. The court also established that the prosecution would not seek irrelevant and prejudicial testimony from B.S. describing the acts of domestic violence. Though defendant argues G.S.'s testimony that she was scared of defendant because she "knew what my mom had been through," knew things like this could happen, and knew "who he was" was sufficient to prove her fear of defendant, that testimony was given meaning because G.S. explained that she heard defendant hitting her mother and its effect on her. In light of the trial court's careful weighing of the probative value of the evidence compared with its potential for prejudice and the constraints it imposed regarding the extent of the domestic violence that would be admitted, the trial court did not abuse its discretion. (See, e.g., *People v. Bell* (2019) 7 Cal.5th 70, 105 [trial court's exercise of discretion under Evid. Code, § 352 will not be disturbed " 'unless it was arbitrary, capricious, or patently absurd and the ruling resulted in a miscarriage of justice' "].)

Finally, we conclude any error in admitting evidence that G.S. heard defendant's acts of violence against her mother or that her mother denied the abuse but G.S. did not believe her was harmless. As noted above, the court

35

instructed the jury not to use the evidence of defendant's acts of violence against B.S. as evidence of his propensity to commit the crimes alleged or evidence of his bad character. Further, defendant's theory of the case relied heavily on this evidence. When cross-examining G.S., defense counsel's questioning emphasized that G.S. was scared of defendant because of what he had done to her mother, that she was scared and angry because she thought defendant was hurting her mother, that she wanted to protect her mother from defendant, and that she was scared he was going to hurt her like she thought he was hurting her mother. In his closing argument to the jury, counsel emphasized G.S. had "testified to witnessing some very intense domestic violence inflicted on her mother." Counsel reminded the jury G.S. felt scared when defendant was hurting her mother, suggested her mother's denials must have made her feel "frustrated and sad and incredibly despondent," and theorized she "hated Mr. Silva for what he did to her mother," and wanted to be sure he would stay out of their lives forever. In light of the instructions to the jury and the centrality of the domestic violence evidence to the defense theory of the case, we conclude any error in admission of this evidence was harmless.

### 3. Other Bad Acts Evidence

Defendant raises several challenges to evidence regarding uncharged criminal conduct or other "bad acts" which he contends had little or no probative value, but were highly inflammatory and should have been excluded under Evidence Code section 352. Although evidence of uncharged crimes or conduct may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, such evidence may be excluded if its probative value is substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of

36

confusing the issues, or of misleading the jury. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1130; *People v. Williams* (2018) 23 Cal.App.5th 396, 417; Evid. Code, §§ 1101, 352.)

Defendant argues the trial court should have excluded G.S.'s MDI statement that she "would always hear" that defendant had broken four of his ex-wife's ribs. During pretrial discussions, the court indicated it was important to know when G.S. heard the statement to determine whether it was relevant, particularly as to the force or fear element of section 288, subdivision (b). The prosecutor agreed, though he also argued that even if she heard the statement after the incidents, it would be relevant to her delayed disclosure. After an extended discussion, the trial court indicated it would defer a decision on the admission of the statement until it could be determined when G.S. heard it.

When the parties again revisited the admissibility of the ribs statement, the trial court said: "[L]et me indicate having watched this video, it does seem to me it is all so intertwined with what is going on with this child, with the issue about *when you are doing things and why*, that I'm struggling more to exclude it." (Italics added.) The court also commented, "When you think about what she's saying, one could raise any number of issues that may actually be beneficial to the defense. But I'm struggling with excluding it. I just think, when you look at the gumbo of what is going on with this young girl and you stir it all in a pot, I'm struggling with the idea of how I remove those spices." Defense counsel again asserted the statement was "incredibly inflammatory" and noted the "key question" is "when" she made the statement. The trial court agreed it "would help" to know when the statement was heard, and the prosecutor agreed there was "[n]o question that it would be a relevant factor." Defense counsel reiterated his argument

37

that the evidence was too prejudicial and irrelevant to whether G.S. submitted to defendant's acts because she feared him.

The trial court then stated it thought there were "multiple interpretations of this evidence. Some of them that are not prejudicial to the defendant." The court asked the parties whether there was any basis to believe the statement was true. After the parties confirmed there was not, the court said: "I'm going to order it's admissible but I am bar[r]ing any other evidence of the topic offered by the prosecution. I'm not going to allow you to ask the mom why she said it. I'm not going to ask let [*sic*] you offer any evidence if you now discover evidence that, in fact, is true, that would be late discovery. And so, I think this is so inextricably intertwined I'm a little concerned about the fact that it's relevant, may vary depending on when she learned this thing. But, maybe we have to address that with the jury, maybe I have to revisit it with some special or limiting instruction. But for now I'm going to allow it with that caveat. We're not going to litigate the underlying truth of the statement." The court added it that it would not prevent defense counsel from arguing to the jury that if it were true, they would have heard proof it had happened.

At trial, G.S. testified she "overheard" her mother talking about "something that [defendant] did to his previous wife," but it was after defendant and B.S. had broken up, and was not something in her mind at the time of the molestations.

When the parties were discussing jury instructions with the court, the court asked if the defense still wanted a limiting instruction with respect to the ribs statement. Defense counsel affirmed he did, and the parties and court then discussed defendant's proposed language. The prosecutor flagged the issue that "she said she only learned about this after the molest had

ended" and suggested the language might "go into her late reporting portion." The court then suggested the language ultimately adopted, to which both parties agreed.

On this record, we conclude the trial court did not abuse its discretion in allowing the evidence. As the record reflects, the court engaged in an extended colloquy with the parties about the probative value of the evidence and its relevance to G.S.'s state of mind of fear. The court considered the prejudicial potential of the evidence, but concluded it was so "inextricably intertwined" with G.S.'s state of mind and "with what is going on with this child, with the issue about when are you doing things and why, that I'm struggling more to exclude it." These statements suggest the trial court found the evidence relevant to G.S.'s fear of defendant as a reason for her delayed reporting of the abuse. The trial court also observed that the evidence could be helpful to the defense, that it would not allow the prosecution to present any evidence that it was true, and that it would not prevent the defense from arguing it was untrue.[16] Moreover, as noted above, the court instructed the jury that it could not use evidence about defendant's acts of violence against B.S. *and others* as character or propensity evidence but only as to G.S.'s "state of mind and/or her fear."

Even if the court erred in admitting the statement, it is not reasonably probable defendant would have obtained a more favorable verdict had the

---

[16] In closing argument, defense counsel expressly asked the jury to "[r]emember the statement . . . that [G.S.] said in the interview about what she said Mr. Silva did to his ex-wife." He reminded the jury the statement was something B.S. told G.S. "after the fact," that there was no evidence it was true, and that G.S. "thr[e]w [it] in there just to make extra sure, just to incriminate Mr. Silva a little bit more, to tell the police why he's such a bad guy. Why he should be away and out of their lives forever. So that's what she did. She talked to them and she made sure that that would happen."

court excluded the evidence. (*People v. Carter* (2005) 36 Cal.4th 1114, 1152 [error in admitting evidence of uncharged misconduct does not require reversal unless it is reasonably probable outcome would have been more favorable had the evidence been excluded].)  Given the much more relevant and damaging evidence about defendant's acts toward her mother, the fear that generated in G.S., and the defense argument that she was motivated to fabricate the molestations because she was scared of defendant, it is unlikely the exclusion of the statement that G.S. heard he had broken four of his ex-wife's ribs would have altered the jury's verdict.

Defendant also challenges the trial court's admission of evidence that defendant took away G.S.'s dogs and that, at one point, B.S. had asked G.S. to call the police but defendant had taken away her phone.  Defendant contends the evidence defendant took away her dogs and her cell phone had no probative value, was highly inflammatory, and improperly appealed to the jury's sympathies.

We disagree this evidence had no probative value.  It tended to show not only that defendant had control over G.S. and the things that were important to her, but that she *believed* he exercised such control.  The evidence that G.S. feared defendant because he took away some of the things that were most important to her was probative as to why she submitted to the abuse.  It was also relevant and probative as to her credibility because it demonstrated to the jury her state of mind while the abuse was happening and may have contributed to her delayed disclosure of the molestations.  (See, e.g., *People v. Rodriguez* (1999) 20 Cal.4th 1, 9 ["A matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue"].)

Regardless, any error in admitting the evidence was harmless. The evidence that defendant took away G.S.'s dogs and phone was substantially less inflammatory than the evidence regarding the charged molestation offenses. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [fact that evidence regarding uncharged conduct was no stronger and no more inflammatory than charged crimes decreased potential for prejudice]; *People v. Foster* (2010) 50 Cal.4th 1301, 1332 [same].) The fact that G.S.'s mother also participated in taking away the dogs further mitigated the prejudice of that evidence.

Defendant also contends the trial court erred in admitting the following highly prejudicial, minimally probative evidence that improperly appealed to the jury's sympathies: that G.S.'s sisters did not like defendant because he was hitting their mother and that they moved out because G.S. told them she felt uncomfortable with him;[17] that it really hurt when her sisters moved out because they were the only people she could talk to and she was unable to see half of her family because of defendant; that defendant "took away half of her childhood"; that G.S.'s little sister did not want to sleep in her own room alone; that G.S. and her little sister could hear defendant hitting their mother from their room; that she would cover her little sister's ears; that G.S. told her mother she stayed in her room because she wanted to protect her little sister; that she was afraid for her own and her little sister's life; and that G.S. said she was defendant's "sex doll."

Defendant presents all of this evidence together in an attempt to show the trial court allowed excessive evidence aimed at painting defendant as a

---

[17] Defendant contends the evidence the sisters moved out because they did not like defendant was hearsay, but we disagree because the statement was not offered for the truth of the matter asserted, but to show G.S.'s state of mind.

41

bad man and playing on the jury's sympathy rather than proving any issue relevant to the charges. But considered properly in context, all of this evidence was highly relevant to G.S.'s state of mind during the abuse and her reasons for not disclosing it. The statement about defendant taking away half of her childhood, for example, happened at the dining room table when G.S. screamed in apparent frustration about the abuse, but stopped when defendant gave her a mean look that she understood meant to be quiet. The circumstances surrounding that interaction are highly relevant to the fear she felt, defendant's control over her, and her delayed disclosure. The statement that she was defendant's "sex doll" was made in explaining why she eventually gave up physically resisting the molestations—because her mother still would not leave defendant despite their fights and his hitting her; G.S. "felt like it was never gonna be over" and "because . . . [G.S.] was over trying to fight." Further, all of the evidence about G.S.'s sadness at the loss of her older sisters and fear for herself and her little sister was highly relevant to her explanation for submission to the abuse, her delayed disclosure, and her credibility as a witness. In any event, the trial court expressly instructed the jury to not let sympathy influence its decision.

Defendant challenges statements in the MDI suggesting he had been in jail multiple times and his brother "just went to jail for his whole entire life" because he had raped a 10 year old. While we agree with defendant that these statements are prejudicial and appear to have no relevance to the issues at trial, defendant did not raise a specific challenge to those statements in the trial court and has therefore forfeited the argument on

42

appeal.[18]  In any event, it is unlikely exclusion of those statements would have made a difference in the outcome of the trial in light of all the other properly admitted evidence.  Accordingly, any error in admitting the statements was harmless.

Finally, defendant challenges the statement that G.S. overheard defendant say, " 'I should have just raped your daughters' " to B.S. when they were fighting.  As with some of the other Evidence Code section 352 challenges defendant raised, the trial court and counsel had several discussions on the record about the admissibility of and risk of prejudice from this statement.  Defense counsel argued it was not really a threat of future harm and was unnecessarily prejudicial.  The prosecutor argued it was not only relevant to G.S.'s state of mind of fear, but also defendant's motive because defendant was saying " 'I should have just raped your daughters' " in a sex case.  While recognizing the statement was "dynamite, maybe" and "maybe harmful to Mr. Silva," the court concluded it was "so inextricably intertwined with the idea of what is going on in this child's head that I don't see how I can exclude it."  Ultimately the trial court allowed the statement for its effect on G.S., as relevant to her state of mind, but again indicated limiting instructions may be appropriate and told the prosecutor he would likely not be able to seek to corroborate the statement.

---

[18] We recognize the statement about defendant's brother and the statement that B.S. bailed defendant out of jail and he "is in jail now" were both made in the MDI.  Defendant objected *generally* to the MDI as more prejudicial than probative, but as we have discussed at length above, he also raised many specific challenges to statements in the MDI.  Defendant did not, however, specifically challenge these statements, nor did he object to G.S.'s statement at trial "the first time he went to jail."  (See Evid. Code, § 353, subd. (a) [party must have made a timely, specific objection at trial to argue evidentiary error on appeal].)

While it is indeed inflammatory, G.S. said in the MDI that she overheard defendant utter these words when he was fighting with her mother. Accordingly, the evidence was highly relevant to G.S.'s fear of defendant and explanation for her submission to the molestations and delayed disclosure. (See, e.g., *People v. Nguyen* (2015) 61 Cal.4th 1015, 1035 [prejudice that Evid. Code, § 352 is designed to avoid is not the prejudice that flows naturally from relevant evidence, but that which tends to evoke an emotional bias against the party with very little effect on the issues; " ' " 'prejudicial' is not synonymous with 'damaging' " ' "].) In any event, the evidence was arguably beneficial to the defense, because at trial G.S. testified she did not remember saying anything to her mother about rape, an issue defense counsel highlighted in his closing statement to challenge her credibility. Thus, any error in admitting the statement was harmless.

### 4. *Hearsay Statements*

Defendant argues the trial court erred by admitting irrelevant and prejudicial hearsay, including G.S.'s statement in the MDI that when she told B.S. about the abuse, there was a lot of crying and apologies, and G.S.'s testimony at trial that when she disclosed the abuse, B.S. believed her. Defendant also challenges B.S.'s testimony at trial regarding what G.S. told her about what defendant did to her, i.e., her description of the molestations. At trial, B.S. testified G.S. told her defendant had fondled his penis, touched it until it was slimy, and then forced his fingers into G.S.'s mouth. He would grab G.S. from the back and grab her breasts, rub her, and pull her into him and tell her to be quiet. B.S. also testified that G.S. said she did not disclose the abuse earlier because defendant told her he was going to kill B.S.

As to G.S.'s testimony at trial that her mother believed her when she disclosed the abuse, defendant forfeited his argument on appeal by failing to

object at trial. (Evid. Code, § 353, subd. (a).) As to G.S.'s MDI statement that both she and her mother cried when she disclosed the abuse and B.S. apologized for letting it happen, defendant likewise failed to object to that particular statement in the MDI. In any event, even if we were to consider defendant's argument on the merits, we would reject it.

Defendant contends G.S.'s statement that her mother believed her when she disclosed the abuse prejudiced defendant by allowing inadmissible hearsay regarding an improper lay opinion that bolstered G.S.'s credibility.[19] (See, e.g., *People v. Melton* (1988) 44 Cal.3d 713, 744 ["Lay opinion about the veracity of particular statements by others is inadmissible on that issue."].) However, under the circumstances here, any error in admitting G.S.'s testimony at trial and MDI statement was harmless. First, the statements were very brief. Second, reasonable jurors would expect a parent to have sympathy for a child disclosing abuse, and it is not surprising that a parent would believe their child. Although defendant attempts to analogize to *People v. Sergill* (1982) 138 Cal.App.3d 34, 40, that case is entirely distinguishable. In *Sergill*, the admission of two police officers' testimony that an alleged child victim in a molestation case was telling the truth, combined with the court's comment that one of the officers was specially qualified to render an opinion about whether a person reporting a crime was telling the truth, was prejudicial error. (*Id.* at pp. 40–41.) That situation, in which two presumptively neutral, nonrelative witnesses testified the child was telling the truth, and a judge confirmed one of them was specially

---

[19] We do note the trial court ruled before trial that witnesses, including B.S., would not be allowed to offer an opinion that the complaining witness was telling the truth.

qualified to render such an opinion, would clearly carry greater weight with a jury than a parent's belief that their own child is telling the truth.

For the same reasons, G.S.'s statement that she and her mother cried when she reported the abuse and her mother apologized is likewise harmless.[20] The statement that her mother apologized to her, like the statement that she believed her, was brief and not a surprising reaction by a mother to a child's report of abuse. Any error in admitting the statements from G.S. about her mother's reaction when she reported the abuse was harmless.

As to B.S.'s testimony about what G.S. reported defendant did to her, we again conclude the issue is forfeited because defendant failed to object to the testimony at trial. Although it its true defendant asked the court in *pretrial* discussions that B.S.'s testimony be limited to the conditions and circumstances under which the disclosure was made in accordance with the "fresh complaint" doctrine, he did not object at trial when the prosecution asked B.S. what G.S. told her. In any event, B.S.'s testimony about what defendant did was brief and was consistent with what G.S. stated at trial and in her MDI statement. Because the evidence was brief and cumulative, its exclusion would not have changed the verdict.

### 5. Improper Appeals to Sympathy

Defendant argues there was substantial evidence and argument at trial about how the alleged incidents affected G.S. over time. In response to numerous questions from the prosecutor, G.S. testified about her suicidal ideation and suicide attempts, her lengthy course of therapy, her depression

---

[20] We note G.S.'s statement that she and her mother cried when she disclosed the abuse is not hearsay. It is also relevant and admissible as to the circumstances surrounding the disclosure, and is not particularly inflammatory.

46

and anxiety, her loss of self-esteem, her medications, her giving up gymnastics and swimming, and her hair loss and amenorrhea from lost body weight. She affirmed, in response to a leading question from the prosecutor, that all of this was "related to him his [*sic*] fingers in your mouth?" At the MDI she said she was depressed, had drifted away from her best friend, started cutting herself, did not want to be around anyone, found talking to therapists did not help, and felt overwhelming sadness. B.S. also testified about the effect defendant's acts had on G.S., stating she was sad, would cry, stopped participating in gymnastics and swimming, and was seeing a therapist regularly.

Defendant contends all of this evidence was cumulative and constituted improper appeals to the jury for sympathy for G.S. We disagree. As defendant repeatedly argues throughout his briefing, one of the most important contested issues at trial was G.S.'s credibility. The evidence of G.S.'s mental and physical state during, following, and up to the disclosure of the abuse was highly relevant to her credibility as a witness and whether or not the molestations happened, which as defendant argued, was the key issue at trial. The trial court did not abuse its discretion in allowing this evidence.

## D. Due Process

Finally, defendant contends the multiple errors at trial violated his federal due process rights. We disagree.

The " ' "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." ' " (*People v. Henriquez* (2017) 4 Cal.5th 1, 29.) " 'The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair. [Citation.] "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such

quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." ' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 972.)

Defendant asserts the cumulative effect of the trial court's many evidentiary errors requires reversal. As we have discussed in detail above, defendant has demonstrated very few potential errors by the trial court and any potentially erroneous admissions we have considered separately and found to be harmless. " 'Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.' " (*People v. Panah* (2005) 35 Cal.4th 395, 479–480.)

### III. DISPOSITION

The judgment is affirmed.

MARGULIES, ACTING P. J.

WE CONCUR:


BANKE, J.


WISS, J.*


A163801
*People v. Silva*

---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.